UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE OLUFUNMILAYO AJASA, <br><br>         Debtor. | Chapter 7 <br> Case No. 10-50719-ess |
| IN RE JOSEPH LOPEZ, <br><br>         Debtor. | Chapter 7 <br> Case No. 17-46380-ess |
| OLUFUNMILAYO AJASA AND JOSEPH LOPEZ, <br><br>         Debtors and Plaintiffs <br>         on behalf of themselves <br>         and all others similarly <br>         situated, <br><br> v. <br><br> WELLS FARGO BANK, N.A., <br><br>         Defendant. | Adversary Case No. 1-18-01122-ess |

## MEMORANDUM DECISION ON THE DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

*Appearances:*

George F. Carpinello, Esq.
Adam Shaw, Esq.
Boies Schiller Flexner LLP
30 South Pearl Street (11th Floor)
Albany, NY 12207
*Attorneys for Plaintiffs Olufunmilayo*
*Ajasa and Joseph Lopez*

Jarrod D. Shaw, Esq.
Benjamin J. Sitter, Esq.
McGuireWoods LLP
260 Forbes Avenue (Suite 1800)
Pittsburgh, PA 15222
*Attorneys for Defendant Wells Fargo Bank,*
*N.A.*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

<u>**Introduction**</u>

The matter before the court is a motion to dismiss by Defendant Wells Fargo Bank, N.A. ("Wells Fargo") to dismiss the claim of Plaintiff Joseph Lopez that Wells Fargo violated the discharge injunction pursuant to Bankruptcy Code Section 524(a)(2).

In the Amended Complaint, Joseph Lopez joins Plaintiff Olufunmilayo Ajasa in claiming that Wells Fargo violated their discharge injunctions by refusing to correct or update their credit report tradelines to reflect that their respective debts were discharged in bankruptcy. It is worth noting that here, Wells Fargo seeks only the dismissal of the claim of Mr. Lopez, and not the claim of Ms. Ajasa.

Wells Fargo argues that it was not Mr. Lopez's creditor when he filed his bankruptcy case. It states that it should not have been included within the scope of the discharge injunction, since Mr. Lopez's debt to it was extinguished by a transaction reflected in a deed in lieu of foreclosure (the "Deed in Lieu") and other documents that were executed and recorded more than a month before Mr. Lopez filed his Chapter 7 bankruptcy petition. For the same reasons, Wells Fargo contends that Mr. Lopez should not have scheduled it as a creditor in his bankruptcy, and that the tradeline was therefore correct when it did not reflect the discharge in bankruptcy of Mr. Lopez's debt.

Mr. Lopez responds that Wells Fargo's claim survives the Deed in Lieu, and argues that the conduct at issue is not whether Wells Fargo attempted directly to collect on a debt extinguished by the Deed in Lieu, but whether Wells Fargo declined to update the tradeline on his credit report as part of a policy of not updating these tradelines for the purpose of enhancing the collectability of discharged debts. Mr. Lopez also states that even with the Deed in Lieu, he

correctly included Wells Fargo as a creditor in his bankruptcy, and that Wells Fargo was aware that he obtained a discharge – and still, it refused to update or correct his credit report tradeline. For these reasons, Mr. Lopez argues that he has stated a plausible claim for relief, and requests that the Court deny the motion to dismiss his complaint.

## Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to Judiciary Code Sections 157(b)(1) and 1334(b), and the Standing Order of Reference dated August 28, 1986, as amended by the Order dated December 5, 2012, of the United States District Court for the Eastern District of New York.

This Court may also adjudicate these claims to final judgment. Enforcement of the discharge injunction is a core proceeding arising under the Bankruptcy Code. *See In re Nicholas*, 457 B.R. 202, 215 (Bankr. E.D.N.Y. 2011). In addition, the parties have given their consent to this Court entering a final judgment. July 14, 2020 Hearing Tr. at 13:7-14:12, ECF No. 52. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1940 (2015) (holding that in a non-core proceeding, a bankruptcy court may enter final orders "with the consent of all the parties to the proceeding" (quoting 28 U.S.C. § 157(c)(2)).

## Background

### Mr. Lopez's Bankruptcy Case

On November 29, 2017, Joseph Lopez filed a petition for relief under Chapter 7 of the Bankruptcy Code. *In re Joseph Lopez*, Case No. 17-46380, ECF No. 1. He listed Wells Fargo as a secured creditor on Schedule D (Secured Creditors), and listed the property he previously owned located at Fayetteville, North Carolina (the "Property") as an asset of which he was the "sole owner" on Schedule A. On March 14, 2018, the Court entered an order discharging Mr.

Lopez and a final decree.  And on or about March 16, 2018, the Court notified Wells Fargo of the discharge of Mr. Lopez's debt.

*Selected Procedural History of this Adversary Proceeding*

On November 8, 2018, Plaintiff Olufunmilayo Ajasa commenced this adversary proceeding by filing a complaint against Wells Fargo, on behalf of herself and an alleged nationwide class, seeking a declaratory judgment, injunctive relief, and damages arising out of what she describes as Wells Fargo's "systematic practice" of violating the discharge injunction provided by Bankruptcy Code Section 542(a)(2).  Compl., ECF No. 1.  Ms. Ajasa states that Wells Fargo violated the discharge injunction by its practice of failing to update and correct creditor information to credit reporting agencies to reflect that certain discharged debts are no longer due and owing, as they have been "discharged in bankruptcy."  Compl. ¶ 1.  Thereafter, on June 26, 2019, Ms. Ajasa filed an amended complaint to add Mr. Lopez as an additional plaintiff.  Am. Compl., ECF No. 21.

On July 29, 2019, Wells Fargo filed a motion to dismiss Mr. Lopez's claims in the Amended Complaint.  On August 28, 2019, Mr. Lopez filed opposition to the Motion to Dismiss. And on September 13, 2019, Wells Fargo filed a reply to Mr. Lopez's opposition.  On September 24, 2019, the Court heard arguments from the parties, and from time to time, including on July 14, 2020, the Court held continued pre-trial conferences and hearings on the Motion to Dismiss, and the record is now closed.

*The Allegations of the Amended Complaint*

Ms. Ajasa and Mr. Lopez (the "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class Members"), seek a declaratory judgment, injunctive relief, and damages arising from Wells Fargo's alleged "systematic practice" of violating the discharge

injunction provided by Bankruptcy Code Section 542(a)(2).  Am. Compl. ¶ 1.  The Plaintiffs

allege that Wells Fargo has a practice of failing to update and correct creditor information to

credit reporting agencies to reflect that certain debts discharged through a bankruptcy case are no

longer due and owing.  *Id.*  The purpose of this practice, the Plaintiffs state, is to utilize the

coercive effect of an inaccurate credit report to pressure borrowers to pay the debt, thereby

enhancing the collectability of the discharged debts and the overall value of the obligations that

Wells Fargo sells to third parties.  Am. Compl. ¶ 13.

The Plaintiffs allege that Wells Fargo was aware of their bankruptcy discharges, and that

the debts that they owed to it were discharged; Wells Fargo was aware that it was incorrectly

reporting on the status of the accounts; Wells Fargo was able to update or correct its reporting on

the status of the accounts following the entry of a bankruptcy discharge in their respective cases;

and Wells Fargo "willfully failed to update or correct Plaintiffs' or other Class Members' credit

reports because it has adopted a policy of not updating credit information for debts that are

discharged in bankruptcy for the purpose of collecting such discharged debt."  Am. Compl. ¶ 8.

They allege that by not updating the credit information on former bankruptcy debtors'

accounts, Wells Fargo "enhances the value of the debt it sells to third parties because third

parties will pay Defendant more for delinquent debts if the third party knows that Defendant will

not update the debtors' credit reports to list the debt as discharged in bankruptcy."  Am. Compl. ¶

13.  The Plaintiffs further state that Wells Fargo has a "direct financial interest" in the collection

of the discharged debts, because it retains a percentage interest in amounts paid on discharged

debts that are paid directly to Wells Fargo.  Am. Compl. ¶ 14.  And they allege that Wells Fargo

has been aware that this conduct was illegal since at least 2007.  Am. Compl. ¶ 16.

In reference to Mr. Lopez, the Amended Complaint states that on or about February 27,

2019, more than eleven months after receiving his bankruptcy discharge, Mr. Lopez obtained a copy of his credit report from Equifax. Am. Compl. ¶ 42. Mr. Lopez claims that Wells Fargo reported his account as "over 120 days past due" in that report. Am. Compl. ¶ 44. That same day, he contacted Wells Fargo to demand that Wells Fargo correct his tradeline to reflect that the debt was discharged in his bankruptcy, and that Wells Fargo's representative refused his request. Am. Compl. ¶¶ 45-46.

Due to Wells Fargo's refusal to update his tradeline, Mr. Lopez claims that he was "denied his fresh start" provided by the bankruptcy discharge, as he "was aware that his ability to obtain credit, housing, student loans or employment was adversely affected by the erroneous credit information." Am. Compl. ¶ 47.

The Plaintiffs request that this Court declare Wells Fargo's practices to be in violation of their rights and those of the Class Members, and in contempt of the statutory discharge injunction set forth in Bankruptcy Code Section 524(a)(2). They seek permanent injunctive relief requiring Wells Fargo immediately to correct and update the credit reporting records of all class members. Am. Compl. ¶ 90. They also seek an award of compensatory and punitive damages, as well as attorneys' fees and costs. *Id*.

*Wells Fargo's Motion to Dismiss*

On July 29, 2019, Wells Fargo moved to dismiss Mr. Lopez's claims. In its memorandum of law (the "Def's Mem."), Wells Fargo seeks dismissal of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), as incorporated by Bankruptcy Rule 7012. Mr. Lopez opposes the relief sought by Wells Fargo, and on August 28, 2019, filed a memorandum of law in opposition to the Motion to Dismiss (the "Plf's Opp."). On September

13, 2019, Wells Fargo filed a reply memorandum in further support of its Motion to Dismiss (the "Def's Reply").

In support of its Motion to Dismiss, Wells Fargo sets forth several additional facts that are outside the allegations of the Amended Complaint. It states that on September 27, 2017, Mr. Lopez and Wells Fargo executed a Deed in Lieu for the Property he owned at that time. Def's Mem. at 3. The same day, Mr. Lopez also executed an estoppel affidavit, affirming that he received consideration for the deed.

Wells Fargo also submits several documents in support of its Motion to Dismiss. These include the Deed in Lieu, an estoppel affidavit signed by Mr. Lopez (the "Estoppel Affidavit"), and a satisfaction of security instrument (the "Lien Release") signed by a Wells Fargo representative (collectively, the "Deed in Lieu Documents"). Def's Mem. at Exhs. A, B (Deed in Lieu, Lien Release). The Deed in Lieu and Estoppel Affidavit were signed on September 27, 2017, and the Lien Release was signed on October 4, 2017, all before the date of Mr. Lopez's bankruptcy filing. *Id.*

The Deed in Lieu states in part:

[G]rantee [Wells Fargo] covenants and agrees that it shall forever forebear taking any action whatsoever to collect against grantor on the obligations which are secured by the mortgage/deed of trust [and] grantee shall not seek, obtain or permit a deficiency judgment against grantors, their heirs, successors or assigns, such right being hereby waived.

Def's Mem. at Exh. A (Deed in Lieu). It further states that "[t]he true and actual consideration for this transfer consists of . . . grantee's waiver of its right to bring an action against grantor based on the promissory note secured by the mortgage." *Id.* And it states that Wells Fargo also paid a sum of $179,605.55 to Mr. Lopez and his spouse as part of the consideration for obtaining the deed to the Property.

The Estoppel Affidavit states that Wells Fargo agrees to "forbear taking any action against affiant to collect on the obligations secured by the mortgage described below, other than by foreclosure of that mortgage and to not seek, obtain or permit a deficiency judgment against affiant in such foreclosure action." *Id.* In addition, the Lien Release states: "[t]his Satisfaction terminates the effectiveness of the security instrument." Def's Mem. at Exh. B (Lien Release).

And Wells Fargo asserts that on October 12, 2017, Wells Fargo recorded the Deed in Lieu in the public records, along with a "Satisfaction of Security Instrument", providing public notice that the mortgage has been satisfied.

Finally, Wells Fargo states that on November 29, 2017, more than two months after executing the Deed in Lieu, Mr. Lopez filed his Chapter 7 bankruptcy petition. He listed the Wells Fargo mortgage debt on Schedule D and listed the Property as an asset of which he was the "sole owner." Def's Mem. at 4.

Wells Fargo argues that the publicly recorded Deed in Lieu extinguished Mr. Lopez's mortgage debt in its entirety and that Mr. Lopez "erroneously" listed Wells Fargo's debt in Schedule D and the Property in Schedule A, as he no longer was the owner of the Property and no longer owed any debt to Wells Fargo when he filed for bankruptcy. Def's Mem. at 7.

Wells Fargo reasons that, since the debt was "extinguished" before the filing of Mr. Lopez's bankruptcy petition, he did not owe a debt to Wells Fargo as defined in Bankruptcy Code Section 101(12) as of the date of his bankruptcy filing. Def's Mem. at 8. It argues that under New York law, a Deed in Lieu that releases the mortgagor from all liabilities extinguishes any liability that a mortgagor may have for the debt. In support of this argument, it points to a New York State appellate decision holding that a deed in lieu given by a mortgagor in exchange for the mortgagee's release of the mortgagor from liability under the mortgage constitutes an

express merger of the deed with the mortgage, and extinguishes the mortgagor's obligations. Def's Mem. at 8 (citing *TPZ Corp. v. Dabbs,* 25 A.D.3d. 787, 793 (N.Y. App. Div. 2d Dep't 2006)).

For these reasons, Wells Fargo argues, it is not a "creditor" of Mr. Lopez, as the term is defined in Section 101(10)(A), because, in substance, Mr. Lopez no longer owes it a debt. Wells Fargo notes that, as the Second Circuit has held, the discharge injunction "permanently enjoins creditor actions to collect discharged debts," and "'only a preconfirmation creditor or holder of such a claim is bound by the plain language of the [injunction].'" Def's Mem. at 9 (quoting *In re Kalikow*, 602 F.3d 82, 94 (2d Cir. 2010)).

And Wells Fargo argues that "a party cannot violate an injunction to which it is not even subject," and points to this Court's decision in *Homaidan v. Sallie Mae, Inc.* (*In re Homaidan*), 596 B.R. 86, 96 (Bankr. E.D.N.Y. 2019), stating that "of course, for a discharge injunction claim to lie, the debt at issue must be within the scope of the debtor's dischargeable debt." Def's Mem. at 9. In sum, Wells Fargo argues that as a consequence of the Deed in Lieu, it held no claim, as defined in Bankruptcy Code Section 101(5)(A), against Mr. Lopez when he filed his bankruptcy case, and thus was not Mr. Lopez's creditor, or bound by the discharge injunction in his case. Based on the foregoing, Wells Fargo argues that the tradeline in Mr. Lopez's credit report is accurate when it states "deed in lieu", shows a zero balance with the account marked as "CLOSED", and does not state "included in bankruptcy." Def's Mem. at 9-10.

Wells Fargo also argues that Mr. Lopez's situation, where there is a zero tradeline balance and the debt has not been sold to another party, can be distinguished from the cases relied upon by Mr. Lopez to show the coercive effect of creditors refusing to correct tradelines. In those cases, Wells Fargo notes, the tradelines that were not corrected reflected a balance, or

the debt was sold to a third party pursuant to an agreement where the original creditor retained a financial interest in the debt. Def's Reply at 6-7 (addressing *Torres v. Chase Bank USA, N.A.* (*In re Torres*), 367 B.R. 478 (Bankr. S.D.N.Y. 2007); *McKenzie-Gilyard v. HSBC Bank Nevada, N.A.* (*In re McKenzie-Gilyard*), 388 B.R. 474 (Bankr. E.D.N.Y. 2007); *Russell v. Chase Bank USA, NA* (*In re Russell*), 378 B.R. 735 (E.D.N.Y. 2007)). And Wells Fargo notes that when Mr. Lopez describes the tradeline as listing the debt as "120 days past due" or having a balance other than zero, he is seizing on a "historical notation" in his credit report showing that he once had a past due amount due on his account, and does not take into account the zero current balance. Def's Reply at 2.

In addition, Wells Fargo argues that its alleged actions do not meet the standard necessary to warrant a civil contempt finding for a violation of the discharge injunction. It points to the Supreme Court's recent decision in *Taggart v. Lorenzen,* 139 S. Ct. 1795 (2019), for the applicable standard: the plaintiff must establish that "there is 'no objective reasonable basis for concluding that the creditor's conduct might be lawful.'" Def's Mem. at 11 (quoting *Taggart*, 139 S. Ct. at 1801).

And finally, Wells Fargo argues that the only allegation concerning its actions with respect to Mr. Lopez is that it did not agree to report his former mortgage debt as "discharged in bankruptcy" to credit reporting agencies. It denies that it had an alleged "clear economic incentive to violate the discharge injunction," since Mr. Lopez obtained a debt waiver and his debt was never sold. Def's Mem. at 11 (quoting Am. Compl. ¶ 74). Because of this, Wells Fargo contends that it "could not have any 'objectively reasonable basis' for concluding that declining to report a debt as discharged in bankruptcy that was not, in fact, discharged in bankruptcy 'might be lawful.'" Def's Mem. at 11 (quoting *Taggart,* 139 S. Ct. at 1799).

*Mr. Lopez's Opposition to the Motion to Dismiss*

Mr. Lopez opposes the dismissal of his Amended Complaint, and on August 28, 2019, filed a memorandum of law in opposition to the Motion to Dismiss.  He includes as exhibits, among other documents, copies of his credit reports from Equifax and TransUnion.  The Equifax tradeline shows the account status in the "Summary" section to be "over 120 days past due" with a zero balance and the words "[f]orfeit of deed in lieu of foreclosure" under the Comments section.  Plf's Opp. at Exh. A (Equifax credit report).  The TransUnion tradeline shows the pay status as "Account 120 Days Past Due Dates," states that the maximum delinquency was "120 days in 10/2017 for $4,608 and in 11/2017", and includes the words "DEED IN LIEU" as a remark.  Plf's Opp. at Exh. B (TransUnion credit report).

Mr. Lopez responds that the Deed in Lieu and estoppel affidavit do not constitute a release of the debt, and act only as a "legal, contractual defense" against Wells Fargo.  Plf's Opp. at 5.  He also argues that Wells Fargo continues to assert publicly that he owes a debt to it by declaring the debt to be 120 days past due and listing a balance of $4,608 on the credit report tradeline.  Plf's Opp. at 5.  As a consequence, Mr. Lopez argues, Wells Fargo has a claim that is subject to his bankruptcy discharge.

And Mr. Lopez points to the Supreme Court's interpretation of what constitutes a "claim" under Bankruptcy Code Section 101(5)(A).  He notes that the Supreme Court has observed that "'Congress intended to adopt the broadest available definition of "claim"'" and that the Bankruptcy Code makes it clear that even an unenforceable claim is nonetheless a "'right to payment,'" and hence a claim.  Plf's Opp. at 5 (quoting *Midland Funding, LLC v. Johnson,* 137 S. Ct. 1407, 1412 (2017)).

Applying this definition, Mr. Lopez asserts that, while Wells Fargo may be estopped

from collecting any deficiency based upon its representation in the Deed in Lieu and supporting documents, Wells Fargo still had a "claim" for such a deficiency when Mr. Lopez filed his Chapter 7 petition.

With respect to the tradeline notations, Mr. Lopez responds that the act of "reporting a debt as past due when it is not, in fact, due is an attempt to collect on that debt." Plf's Opp. at 7. He highlights the coercive effect of this in one case where the debtors paid an amount to the creditor after the creditor agreed to correct the erroneous information if the debtors paid the debt in an agreed-upon amount, as the debtors "'feared they would lose their home loan if they did not do so.'" Plf's Opp. at 7 (quoting *In re Torres*, 367 B.R. at 486).

In addition, Mr. Lopez responds that his claim is not based on Wells Fargo's particular intent as to him individually, but rather, that Wells Fargo acted willfully because it was "enforcing a policy of refusing to correct credit reports . . . for which it has no other business purpose other than to enhance the collectability of that discharged debt." Plf's Opp. at 8. And Mr. Lopez notes that, as another bankruptcy court has observed, "[Wells Fargo] has a policy 'because it makes money off of it, and it makes money off of it because it thinks it's found a way to get around cases . . . by saying, oh, it's not really the creditor.'" Plf's Opp. at 8 (quoting *Bruce v. Citibank* (*In re Bruce*), Adv. Proc. No. 14-08224 (Bankr. S.D.N.Y. 2019)), April 1, 2015 Hearing Tr. 34:25-35:3, ECF No. 80.

Finally, Mr. Lopez argues that the Supreme Court's decision in *Taggart* does not require a different result, because there, the Supreme Court distinguished the case before it from cases where the creditor acts in subjective bad faith, such as where a creditor "intends to collect on a debt it knows is discharged." Plf's Opp. at 9.

## The Applicable Legal Standards

*The Pleading Requirements of Federal Rule of Civil Procedure 12(b)(6)*

Federal Rule of Civil Procedure 12(b)(6) provides that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). As the Supreme Court has held, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted). The plaintiff is not required to demonstrate a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "plausibility" requires "more than a sheer possibility" that the defendant is liable. *Iqbal*, 556 U.S. at 678.

Under *Twombly* and *Iqbal*, courts employ a two-step approach in assessing Rule 12(b)(6) motions. *Iqbal*, 556 U.S. at 679. First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *DiFolco v. MSNBC Cable, LLC,* 622 F.3d 104, 110-11 (2d Cir. 2010); *Shafferman v. Queens Borough Pub. Library (In re JMK Constr. Grp., Ltd.)*, 502 B.R. 396, 408 (Bankr. S.D.N.Y. 2013) (quoting *Iqbal,* 556 U.S. at 678). Within this first step, the court should "'draw[] all reasonable inferences in the plaintiff's favor.'" *DiFolco*, 622 F.3d at 110-11 (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). "Second, the court must determine if well-pleaded factual allegations state a 'plausible claim for relief.'" *In re JMK Constr. Grp., Ltd.)*, 502 B.R. at 409 (quoting *Iqbal*, 556 U.S. at 679).

With this two-step approach, "the Court's objective is not to determine whether the

claimant will succeed in [his] claim, but instead whether the claimant is entitled to support [his] claim by offering evidence." *In re JMK Constr. Grp., Ltd.,* 502 B.R. at 408 (citing *Hilaturas Miel, S.L. v. Republic of Iraq,* 573 F. Supp. 2d 781, 797 (S.D.N.Y. 2008)).

Where the defendant looks to matters outside the pleadings, additional considerations are raised.  In these circumstances, the motion may be treated as one for summary judgment, and the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  At the same time, a court "may properly rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)."  *Bd. of Managers of 195 Hudson St. Condo. v. Jeffrey M. Brown Assocs., Inc.,* 652 F. Supp. 2d 463, 471 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) (stating that "[i]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)").  And matters "'judicially noticed by the District Court are not considered matters outside the pleadings.'" *Geron v. Seyfarth Shaw LLP* (*In re Thelen LLP*), 736 F.3d 213, 219 (2d Cir. 2013) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 426 (2d Cir. 2008)).

*The Definitions of "Creditor" and "Claim" Under Bankruptcy Code Section 101*

The Bankruptcy Code defines the term "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."  11 U.S.C. § 101(10)(A).  A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  By adopting a single – and sweeping – definition of "claim", Congress intended for the term to be interpreted broadly.  *See Midland Funding,* 137 S. Ct. at 1412; *Johnson v. Homestate Bank*, 501 U.S. 78, 83

(1991) (observing that "[w]e have previously explained that Congress intended by this language to adopt the broadest available definition of 'claim.'").

And this breadth is sufficient to encompass even an unenforceable claim. As the Supreme Court observed in *Midland Funding*, Section 101(5)(A) "makes clear that the unenforceable claim is nonetheless a 'right to payment,' hence a 'claim,' as the [Bankruptcy] Code uses those terms." *Midland Funding*, 137 S. Ct. at 1412.

*The Elements of a Discharge Injunction Violation Claim*

As this Court has observed, "[o]ne of the fundamental principles of bankruptcy law is that a bankruptcy discharge enables a debtor to receive a 'fresh start.'" *In re McKenzie-Gilyard*, 388 B.R. at 481 (citing *Marrama v. Citizens Bank,* 549 U.S. 365, 367 (2007)). The discharge injunction is central to this "fresh start," because it protects debtors "from creditors' attempts to collect discharged debts after bankruptcy." *In re McKenzie-Gilyard*, 388 B.R. at 480.

Bankruptcy Code Section 524(a)(2) describes the function of a debtor's discharge in broad terms:

> A discharge in a case under this title—. . . (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

11 U.S.C. § 524(a)(2). This broad scope is confirmed by the legislative history of Section 524(a)(2), which "similarly supports a broad interpretation of an 'act to collect . . . any debt' that violates the Section 524 discharge injunction." *In re McKenzie-Gilyard*, 388 B.R. at 481. As another bankruptcy court observed, "the statute's plain terms obviate consideration of its legislative history . . . but it is worth noting that the legislative history . . . also supports a broad reading of the injunction contained in section 524(a)(2)." *In re*

*Torres*, 367 B.R. at 484-85.  *See In re Russell,* 378 B.R. at 741 (stating that a broad

reading of Section 524(a)(2) is supported by legislative history).

      To state a plausible discharge injunction violation claim in the circumstances present

here, a debtor must allege that the defendant was a creditor at the time of his bankruptcy filing;

that it was aware of the plaintiff's bankruptcy discharge; that it was aware that it was reporting

on the status of the account incorrectly; that it had the ability to update or correct its reporting on

the status of the account after the plaintiff received his bankruptcy discharge; and that it willfully

did not do so.  *See In re McKenzie-Gilyard*, 388 B.R. at 482.  Of course, for a discharge

injunction claim to lie, the debt at issue must be within the scope of the debtor's dischargeable

debt.  *In re Homaidan*, 596 B.R. at 96 (stating that "[t]he discharge injunction survives the

closure of a bankruptcy case and applies permanently to every debt that is discharged").  *See In

re Azevedo*, 506 B.R. 277, 283 (Bankr. E.D. Cal. 2014) (observing that "[s]howing a violation of

a discharge order by definition requires showing specifically that the order applies to the debt on

which the violation is premised").

      And as the Supreme Court has recently stated, a finding of contempt is appropriate when

an injunction has been violated.  "Under traditional principles of equity practice, courts have

long imposed civil contempt sanctions to 'coerce the defendant into compliance' with an

injunction or 'compensate the complainant for losses' stemming from the defendant's

noncompliance with an injunction."  *Taggart,* 139 S. Ct. at 1801 (quoting *United States v. United

Mine Workers*, 330 U.S. 258, 303-04 (1947)).  In particular, the Supreme Court observed:

> A court may hold a creditor in civil contempt for violating a discharge order if
> there is *no fair ground of doubt* as to whether the order barred the creditor's
> conduct.  In other words, civil contempt may be appropriate if there is no
> objectively reasonable basis for concluding that the creditor's conduct might be
> lawful.

*Taggart*, 139 S. Ct. at 1799.  At the same time, the Court also noted that "[w]e have not held, however, that subjective intent is always irrelevant.  Our cases, suggest, for example, that civil contempt sanctions may be warranted when a party acts in bad faith."  *Taggart*, 139 S. Ct. at 1802.

**Discussion**

To determine whether Mr. Lopez has stated a plausible claim for contempt of the discharge injunction, the Court examines whether Mr. Lopez has alleged each of the elements of a plausible claim for relief.  In this context, those elements are whether Wells Fargo was a creditor at the time of Mr. Lopez's bankruptcy filing; whether it was aware of Mr. Lopez's bankruptcy discharge; whether it was aware that it was reporting on the status of the account incorrectly; whether it had the ability to update or correct its reporting on the status of the account after Mr. Lopez received his bankruptcy discharge, and finally, whether it willfully did not do so.  *See In re McKenzie-Gilyard*, 388 B.R. at 482 (describing elements of a discharge injunction violation claim in the context of a failure to update a credit report).  The Court considers each of these elements in turn.

*Whether Mr. Lopez Has Alleged that Wells Fargo Was a Creditor at the Time of His Bankruptcy Filing*

The first element that Mr. Lopez must allege to state a plausible discharge injunction violation claim is that Wells Fargo was his creditor when he filed his bankruptcy case.  Bankruptcy Code Section 101(10)(A) defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."  11 U.S.C. § 101(10)(A).  The Bankruptcy Code defines a claim, in turn, as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

Wells Fargo argues that it was not Mr. Lopez's creditor when he filed his bankruptcy case as a result of the pre-petition transaction that is reflected in the Deed in Lieu Documents.  It asserts that New York courts have held that a deed in lieu amounts to "'an express merger of the deed with the mortgage, and extinguished all of the defendant's liabilities under the mortgage and note.'"  Def's Mem. at 8 (quoting *TPZ Corp.*, 25 A.D.3d. at 793 (citations omitted)).  Wells Fargo argues that the language in the Deed in Lieu Documents constitutes the merger of the deed and mortgage as described in *TPZ Corp.*  Pursuant to the Deed in Lieu, Wells Fargo agreed to forbear its right to collect indefinitely, and waived its right to bring an action against Mr. Lopez based on the note and mortgage.  The Estoppel Affidavit also contains similar language as to the indefinite forbearance and waiver of collection rights, and the Lien Release terminated the security instrument.  As a consequence, Wells Fargo argues, it has relinquished any right to payment and extinguished its claim.  And with its claim extinguished before Mr. Lopez's bankruptcy filing occurred, Wells Fargo argues that it was no longer Mr. Lopez's creditor as defined in Bankruptcy Code Section 101(10)(A), should not have been included in Mr. Lopez's bankruptcy, and cannot be subject to his bankruptcy discharge.

Mr. Lopez responds that Wells Fargo was still a creditor at the time of his bankruptcy filing because, under bankruptcy law, its claim – even if unenforceable – survived the Deed in Lieu.  He reasons that the Deed in Lieu Documents constitute a defense under contract law to prevent Wells Fargo from collecting on the deficiency, but not a full release of Wells Fargo's claim.  And he states:

> The fundamental problem with Wells Fargo's position is that it never gave a
> release to Mr. Lopez and it continued to assert publicly that Lopez owed a debt to

to Wells Fargo by declaring the debt to be 120 days past due and listing a balance of over $4,000 on his credit report.

Plf's Opp. at 5.  He points to the Supreme Court's observation that "[Bankruptcy Code] section [101(5)] makes clear that the unenforceable claim is nonetheless a 'right to payment,' hence a 'claim.'"  *Midland Funding*, 137 S. Ct. at 1412.

Mr. Lopez also responds that, as stated in the Amended Complaint, his situation and that of the members of the alleged class illustrate the application of Wells Fargo's policy not to update credit report tradelines in order to enhance the collectability of debts that have been discharged in bankruptcy, in violation of the discharge injunction.  And that conduct, he argues, is precisely what is challenged here.

In considering whether Mr. Lopez has alleged adequately that Wells Fargo was his creditor when he filed his bankruptcy case, this Court begins with the Supreme Court's decision in *Midland Funding*.

In *Midland Funding*, the Supreme Court found that a claim that is unenforceable due to the expiration of the statute of limitations period is nevertheless a valid "claim" for purposes of the Bankruptcy Code.  *Midland Funding*, 137 S. Ct. at 1412.  In reaching this conclusion, the Court considered the plain terms of the statutory definition of a "claim," and observed that "[t]he word 'enforceable' does not appear in the [Bankruptcy] Code's definition of 'claim.'"  *Midland Funding,* 137 S. Ct. at 1412.  The Supreme Court also looked to Congressional intent, and found that "'Congress intended . . . to adopt the broadest available definition of "claim."'"  *Midland Funding*, 137 S. Ct. at 1412 (quoting *Johnson*, 501 U.S. at 78).

As the Supreme Court explained:

Section 502(b)(1) of the [Bankruptcy] Code, for example, says that, if a "claim" is "unenforceable," it will be disallowed.  It does not say that an "unenforceable" claim is not a "claim."  Similarly, § 101(5)(A) says that a "claim" is a "right to

payment," "whether or not such right is . . . fixed, *contingent, . . .* [or] *disputed."*
If a contingency does not arise, or if a claimant loses a dispute, then the claim is
unenforceable. Yet this section makes clear that the unenforceable claim is
nonetheless a "right to payment," hence a "claim," as the [Bankruptcy] Code uses
those terms.

*Midland Funding*, 137 S. Ct. at 1412.

Bankruptcy courts have similarly confirmed the broad scope of the Bankruptcy Code's

definition of a "claim," including in the context of asserted discharge violations. For example, in

*Haynes v. Chase Bank USA, N.A.* (*In re Haynes*), 2014 WL 3608891 (Bankr. S.D.N.Y. July 22,

2014), the debtor asserted a claim for a discharge injunction violation on behalf of himself and a

class of similarly situated individuals "premised upon the alleged violation of [the plaintiff's]

and the class members' discharges for failure to correct their credit reports that list their debt,

post discharge under Section 727 of the Bankruptcy Code, as being only 'charged off,' rather

than being 'discharged in bankruptcy." *In re Haynes*, 2014 WL 3608891, at *2. In its motion to

dismiss, the bank argued that because it sold the debt pre-bankruptcy to a third party, "it no

longer has a debt to enforce." *In re Haynes*, 2014 WL 3608891, at *3. To similar effect, the

bank argued that because it no longer owned the debt, it "cannot be seen in a plausible way to

have any interest in continuing to enforce that discharged debt." *In re Haynes*, 2014 WL

3608891, at *4.

The bankruptcy court disagreed, and concluded that the bank's alleged refusal to update

the debtor's credit line, together with its asserted ongoing financial interest in the collection of

the debt, pointed to the conclusion that the plaintiff "states a cause of action against [the bank]

for breach of the discharge under Sections 727 and 524(a)(2) of the Bankruptcy Code for

intentionally assisting in the collection of discharged debt by not correcting the debtors' credit

reports to reflect that the debt has, in fact, been discharged." *In re Haynes*, 2014 WL 3608891,

at *5.

To the same effect, in *In re Torres*, the bankruptcy court denied the bank's motion to dismiss on grounds, among others, that the bank's refusal to update the debtor's credit report could constitute a violation of the discharge injunction due to its coercive effect on the debtor. As the court observed:

> The pressure of not getting a new mortgage or having to pay a higher rate because of a credit report's inaccurate characterization of a discharged debt could well exceed the irritation caused by dunning letters, which one who knows his or her rights under Bankruptcy Code section 524(a) may throw in the trash without fear of adverse consequences. It is reasonable to infer that [the bank], whose business involves making and evaluating credit disclosures, knows this.

*In re Torres,* 367 B.R. at 485-86.

And in *In re Russell*, the bankruptcy court similarly denied a bank's motion to dismiss a claim for a discharge violation arising from the bank's "refusal to provide correct and updated information . . . for the purpose of coercing payment of the discharged debt." *In re Russell,* 378 B.R. at 742. Citing at least six decisions from bankruptcy courts in as many jurisdictions, the court agreed with *In re Torres* in noting that "'the sheer number of cases may suggest that some creditors are systematically taking such action in an effort to diminish the value of a discharge in bankruptcy.'" *In re Russell*, 378 B.R. at 743 (quoting *In re Torres,* 367 B.R. at 486 (internal citation omitted)).

Finally, courts recognize that the prospect of a financial interest in a claim – even a transferred claim, an unenforceable claim, or a discharged claim – is part of the picture when the plausibility of an alleged discharge violation is assessed on a motion to dismiss. As the bankruptcy court found in *In re Haynes,* even though the bank no longer owned the debt, "the complaint sets forth a cause of action that [the bank] is using the inaccuracy of its credit reporting on a systematic basis to further its business of selling debt and its buyer's collection of

such debt." *In re Haynes,* 2014 WL 3608891, at \*5.  And as the bankruptcy court in *In re Bruce*

pointedly observed, "[the bank] has a policy [not to update credit reports] because it makes

money off of it, and it makes money off of it because it thinks it's found a way to get around

cases like *Torres* and the like by saying, Oh, it's not really the creditor."  Plf's Opp. at Exh. D

(*In re Bruce*, April 1, 2015 Hearing Tr. 34:25-35:3).

Here, Mr. Lopes alleges that "[p]rior to November 2017, Plaintiff Lopez obtained a

mortgage from Wells Fargo," and thereafter, "it became delinquent and Wells Fargo reported it

as delinquent to the credit reporting agencies."  Am. Compl. ¶ 36.  He alleges that he listed his

mortgage debt to Wells Fargo on his bankruptcy petition, and that the bankruptcy court provided

notice of the filing to all scheduled creditors, including Wells Fargo.  Am. Compl. ¶¶ 38-39.

Finally, Mr. Lopez alleges that Wells Fargo "has a direct financial interest" in declining

to update the tradeline, because "third parties will pay [Wells Fargo] more for delinquent debts

[that it sells off] if the third party knows that [Wells Fargo] will not update the debtors' credit

reports to list the debt as discharged in bankruptcy."  Am. Compl. ¶¶ 13-14.  He also avers that

Wells Fargo and prospective debt buyers "know that their sole method of debt collection is the

coercive effect of the negative credit reporting that will pressure the discharged debtors to pay

the debt and/or pressure the discharged debtors to contact [Wells Fargo] or the debt purchasers

who can then exert further pressure to pay the debt."  Am. Compl. ¶ 13.  This intentional

conduct, Mr. Lopez alleges, amounts to an attempt to collect on a discharged debt.

Wells Fargo does not dispute that, before the Deed in Lieu transaction, it was a creditor,

and held a claim, against Mr. Lopez.  But even if that Deed in Lieu provided Mr. Lopez with a

defense to a collection action, both the Bankruptcy Code and the cases applying it confirm that

an unenforceable debt remains a "claim" for purposes of the discharge injunction.  As the

Supreme Court has stated, "the unenforceable claim is nonetheless a 'right to payment,' hence a 'claim,' as the [Bankruptcy] Code uses those terms." *Midland Funding*, 137 S. Ct. at 1412.  And as in *Haynes*, "the complaint shows a motive and intent to assist the collection of the discharged debt lying behind [the bank's] refusal to correct the credit reports" – conduct that supports the reasonable inference that, for purposes of the Bankruptcy Code definition, Wells Fargo was a "creditor" and held a "claim." *In re Haynes*, 2014 WL 3608891, at *5.

Taken together, these allegations are sufficient to show that Mr. Lopez has alleged adequately the first element of a plausible discharge violation claim, that Wells Fargo was a creditor at the time of his bankruptcy filing.

## Whether Mr. Lopez Has Alleged that Wells Fargo Was Aware of His Bankruptcy Discharge

The second element that Mr. Lopez must allege to state a plausible discharge injunction violation claim is that Wells Fargo was aware of his bankruptcy discharge.

Here, the Amended Complaint states that Mr. Lopez listed his mortgage debt to Wells Fargo at Schedule D of his bankruptcy petition.  Am. Compl. ¶ 38.  It also states that "on or about March 14, 2018, [the Court] entered an Order discharging Plaintiff Lopez's debts including the debt owed to [Wells Fargo]."  Am. Compl. ¶ 40.  And Mr. Lopez alleges, "on or about March 16, 2018, this Court notified [Wells Fargo] of the discharge of Plaintiff Lopez's debt to [it].  Wells Fargo received the Court's mailing and therefore had actual knowledge that Plaintiff Lopez received a discharge of the debt owed to Wells Fargo."  Am. Compl. ¶ 41.

And thereafter, Mr. Lopez alleges, additional notice was given when "[o]n February 27, 2019, [he] contacted Wells Fargo customer service notifying the customer service representative that his debt with Wells Fargo had been discharged and that Wells Fargo continued to report [his] account as 'over 120 days past due.'"  Am. Compl. ¶ 45.  Mr. Lopez further alleges that

22

"[Wells Fargo] regularly furnishes information to the credit reporting agencies and has access to this data, and can learn at any time the status of a tradeline that reports [it] as a creditor." Am. Compl. ¶ 55.

Taken together, these allegations are sufficient to show that Mr. Lopez has alleged adequately the second element of a plausible discharge violation claim, that Wells Fargo was aware of his bankruptcy discharge.

*Whether Mr. Lopez Has Alleged that Wells Fargo Was Aware that It Was Reporting on the Status of His Account Incorrectly*

The third element that Mr. Lopez must allege to state a plausible discharge injunction violation claim is that Wells Fargo was aware that it was reporting on the status of his account incorrectly.

Wells Fargo argues that Mr. Lopez's credit report tradeline was correct at the time this Amended Complaint was filed, as it reflected that there was a Deed in Lieu and zero current balance, no scheduled payments, and the account was marked as closed. In particular, Wells Fargo argues that the tradeline should not state that Mr. Lopez's debt was discharged in bankruptcy, because the debt was extinguished before his bankruptcy filing by the Deed in Lieu and, therefore, should not have been included in his bankruptcy in the first place. Put another way, Wells Fargo argues that under the Supreme Court's test in *Taggart,* it would have an objectively reasonable basis for concluding that it did not need to update the tradeline, because it was already correct.

Mr. Lopez responds that by declining to update and correct his credit report tradeline, Wells Fargo continued to assert publicly that he owed a debt to Wells Fargo by declaring the debt to be 120 days past due and listing a balance due of more than $4,000 on his credit report. And here too, Mr. Lopez argues that, as alleged in the Amended Complaint, Wells Fargo was

Case 1-18-01122-ess    Doc 54    Filed 08/14/20    Entered 08/14/20 18:15:00

following a policy of refusing to correct credit reports for the purpose of collecting on discharged debts.

Here, as described above, the Amended Complaint states that Wells Fargo received notice of Mr. Lopez's discharge on or about March 16, 2018. Am. Compl. ¶ 41. Mr. Lopez also alleges that after receiving his bankruptcy discharge, he obtained a copy of his credit report from Equifax and learned that Wells Fargo reported his account as "over 120 days past due," indicating that "the debt is still due and owing." Am. Compl. ¶¶ 42, 44.

In addition, Mr. Lopez alleges that he "contacted Wells Fargo customer service notifying the customer service representative that his debt with Wells Fargo had been discharged and that Wels Fargo continued to report [his] account as 'over 120 days past due.'" Am. Compl. ¶ 45. And he alleges that in this conversation, "the Wells Fargo customer service representative refused [his] request to correct his tradeline." Am. Compl. ¶ 46.

And finally, Mr. Lopez alleges that "[Wells Fargo] regularly furnishes information to the credit reporting agencies and has access to this data, and can learn at any time the status of a tradeline that reports [it] as a creditor." Am. Compl. ¶ 55. *See* Am. Compl. ¶¶ 56-58. While Wells Fargo disputes Mr. Lopez's allegations that it was reporting incorrectly on the status of his debt, that is a different matter than whether this element of his discharge injunction violation claim is adequately set forth in the Amended Complaint.

Taken together, these allegations are sufficient to show that Mr. Lopez has alleged adequately the third element of a plausible discharge violation claim, that Wells Fargo was aware that it was reporting on the status of his account incorrectly.

*Whether Mr. Lopez Has Alleged that Wells Fargo Had the Ability To Update or Correct Its Reporting on the Status of His Account*

The fourth element that Mr. Lopez must allege to state a plausible discharge injunction violation claim is that Wells Fargo had the ability to update or correct its reporting on the status of his account.

Wells Fargo argues that, as a threshold matter, Mr. Lopez's "credit report is entirely accurate" because following the Deed in Lieu transaction, "the mortgage account was closed and [his] balance was adjusted to $0." Def's Mem. at 9-10. Wells Fargo also argues that, as it advised Mr. Lopez, it is "'not a credit reporting agency and cannot control how or when [Mr. Lopez's] report will reflect information to other users of credit reports.'" Def's Mem. at 10 (quoting September 13, 2017 letter from Wells Fargo to Mr. Lopez, *In re Lopez,* ECF No. 14-2).

In response, Mr. Lopez points to the allegations that Wells Fargo refused to update or correct his credit report, pursuant to its "*policy* of refusing to correct credit reports . . . for which it has no other business purpose other than to enhance the collectability of that discharged debt." Plf's Opp. at 8.

Here, Mr. Lopez alleges that Wells Fargo, like other banks and financial institutions, furnishes information to credit reporting agencies as to the current status of debts incurred by individuals to whom it has extended credit, and does so in the ordinary course of business. Am. Compl. ¶ 51. He also alleges that Wells Fargo "has the ability to correct or delete the credit information that indicates that [Mr. Lopez's] subject debt is still 'charged off.' Banks and other lending institutions such as [Wells Fargo] have the ability to delete or correct erroneous tradelines, even when those debts have been transferred to other parties." Am. Compl. ¶ 59. In addition, Mr. Lopez alleges that "[m]any banks and other creditors routinely delete or correct tradelines to reflect discharges in bankruptcy, even when those debts have been transferred."

Am. Compl. ¶ 60. And finally, he alleges that Wells Fargo "knows it has the ability to correct these tradelines but has continued to not correct them and refused the requests of [Mr. Lopez and others]" who have asked it to do so." Am. Compl. ¶ 60.

Taken together, these allegations are sufficient to show that Mr. Lopez has alleged adequately the fourth element of a plausible discharge violation claim, that Wells Fargo had the ability to update or correct its reporting on the status of his account.

### *Whether Mr. Lopez Has Alleged that Wells Fargo Willfully Did Not Update or Correct Its Reporting on the Status of His Account*

The final element that Mr. Lopez must allege to state a plausible discharge injunction violation claim is that Wells Fargo willfully did not update or correct its reporting on the status of his account.

Wells Fargo argues that the tradeline was already accurate and did not need to be corrected to reflect Mr. Lopez's bankruptcy discharge, as the Deed in Lieu extinguished the debt and it no longer was Mr. Lopez's creditor. Wells Fargo also argues that it had no economic incentive to refuse to update his credit report tradeline, as the debt had been eliminated and nothing was due. It points to the tradeline in both the Equifax and TransUnion credit reports, showing a zero balance, and referencing a deed in lieu.

Mr. Lopez responds that Wells Fargo's willfulness can be found in its alleged policy not to update tradelines in situations like his. He argues that "the issue is not Wells Fargo's intent with regard to [him]. Rather, the Wells Fargo representative, in refusing to correct [his] credit report, was enforcing a *policy* of refusing to correct credit reports . . . for which it has no . . . business purpose other than to enhance the collectability of that discharged debt." Plf's Opp. at 8.

At the outset, courts agree that a creditor's knowing or intentional failure to update a credit report tradeline to show that a debt has been discharged in bankruptcy, in order to enhance the value of the debt or coerce a debtor into repaying a discharged debt, amounts to willful conduct sufficient to sustain a claim of a discharge injunction violation.  As the court found in *In re Torres*, "courts have had no difficulty recognizing that false or outdated reporting to credit reporting agencies, even without additional collection activity, can constitute an act to extract payment of a debt in violation of section 524(a)(2)."  *In re Torres,* 367 B.R. at 486 (citing cases).

Courts also recognize the significance of the debtor taking the step of notifying the creditor of the allegedly inaccurate credit report.  For example, as the court observed in *In re Russell*, the debtors' discharge injunction claim could fall short where the debtors "did not notify the lender of the inaccuracy of their credit report, nor . . . request the lender to correct it."  *In re Russell,* 378 B.R. at 742.  But where the debtor alleged that he took those steps, the court concluded that the bank's "refusal to provide correct and updated information is for the purpose of coercing payment of the discharged debt," and "the linkage between [the bank's] reporting and collection activity may be inferred."  *In re Russell,* 378 B.R. at 742-43.

Similarly, in *In re Haynes*, the court concluded that where the defendant bank allegedly "is using the inaccuracy of its credit reporting on a systematic basis to further its business of selling debt and its buyer's collection of such debt," and "as a matter of policy refuses to correct [the credit reports]," a claim for a willful violation of the discharge injunction has been stated. *In re Haynes*, 2014 WL 3608891, at *5-*6.  And this Court, too, has followed that path and reached a similar conclusion.  *See In re McKenzie-Gilyard*, 388 B.R. at 482 (on summary judgment, a violation may be found where the failure to update or correct the credit report is willful).  *See also DiBattista v. Selene Finance LP* (*In re DiBattista*), 615 B.R. 31, 43 (S.D.N.Y. 2020)

(affirming in part bankruptcy court's award of sanctions for repeated discharge injunction violations and observing that "a credit report that continues to show an amount past due, especially one that was prepared only after the discharge order, is inaccurate and misleading in a way that causes real harm, and that alone can constitute a violation of a discharge order.").

Here, Mr. Lopez alleges that Wells Fargo "willfully failed to update or correct Plaintiffs' or other Class Members' credit reports because it has adopted a policy of not updating credit information for debts that are discharged in bankruptcy for the purpose of collecting such discharged debt." Am. Compl. ¶ 8. In addition, he alleges:

> Despite the fact that [Wells Fargo] has received notice of the discharge of [Mr. Lopez's] debt . . . [it] has a deliberate policy of not notifying credit reporting agencies that debts formerly owing to [it] are no longer "charged off" or currently still due and owing because they have been discharged in bankruptcy. As [a] result of [Wells Fargo's] policy of not updating the accounts at issue with the credit reporting agencies, debts that have been discharged in bankruptcy are listed on Class Members' credit reports as "past due" and/or "charged off." These notations clearly indicate to potential creditors, employers, or other third parties that a Class Member still owes a debt and that the debt may be subject to collection.

Am. Compl. ¶ 61. To the same effect, he alleges that Wells Fargo "has willfully continued the policy of not updating [Mr. Lopez's] credit reports . . . until the present day." Am. Compl. ¶ 62.

Mr. Lopez also alleges that Wells Fargo has a "deliberate policy" of "refusing . . . requests to remove 'charge offs' and other similar 'past due' notations from . . . debts," and that "[t]his policy of refusing all requests by discharged debtors who ask that [it] remove charge offs from their credit reports independently establishes that [Wells Fargo] is willfully acting to collect discharged debts by not updating credit reports." Am. Compl. ¶¶ 65, 66.

Mr. Lopez also alleges that by not updating the credit information on his accounts, Wells Fargo "enhances the value of the debt it sells to third parties because third parties will pay [it] more for delinquent debts if the third party knows that [Wells Fargo] will not update the debtors'

Case 1-18-01122-ess    Doc 54    Filed 08/14/20    Entered 08/14/20 18:15:00

credit reports to list the debt as discharged in bankruptcy." Am. Compl. ¶ 13. This occurs, he

alleges, because "if the credit information is not updated many Class members will feel

compelled to pay off the debt even though it is discharged in bankruptcy" and "purchasers of

[Wells Fargo's debt know, and are willing to pay more for the fact that, purchasers will be able

to collect portions of [its] sold debt despite the discharge of that debt in bankruptcy." Am.

Compl. ¶ 72.

 In addition, Mr. Lopez alleges that Wells Fargo has a "direct financial interest" in the

collection of the discharged debts, because it retains a percentage interest in amounts paid on

discharged debts that are paid directly to Wells Fargo. Am. Compl. ¶ 14. In particular, "[Wells

Fargo] keeps a percentage of amounts received on discharged debts" and "therefore has a clear

economic incentive to violate the discharge injunction." Am. Compl. ¶¶ 73, 74. To the same

effect, he alleges that Wells Fargo has been aware that this conduct was illegal since at least

2007. Am. Compl. ¶ 16.

 To be sure, Wells Fargo has identified language in Mr. Lopez's Equifax and TransUnion

credit reports that notes a zero balance and a deed in lieu. But this is only part of the picture.

Both the Equifax and the TransUnion credit reports also state that the debt is "over 120 days past

due" or "120 days past due." Plf's Opp. at Exhs. A, B (Equifax, TransUnion credit reports). The

Equifax report also shows a past due amount of $4,608 as of February 2017, and the TransUnion

report lists a "Maximum Delinquency of 120 days in 10/2017 for $4,608 and in 11/2017." *Id.*

And Wells Fargo was unable to state whether it would send back any payment that was made by

the debtor on a discharged debt. February 28, 2019 Hearing Tr. at 40:14-25, ECF No. 17.

 And while Wells Fargo characterizes these as historical notations, it does not explain

why, for example, Mr. Lopez's February 27, 2019 Equifax credit report and July 5, 2018

TransUnion credit report – both issued long after Mr. Lopez's discharge was entered – continue to state that his debt is "over 120 days past due," rather than that the debt was discharged in bankruptcy. Am. Compl. ¶ 41. This is consistent with Mr. Lopez's allegations that Wells Fargo declined to update his credit report tradeline based on "a policy of not updating credit information for debts that are discharged in bankruptcy for the purpose of collecting such discharged debt." Am. Compl. ¶ 8. *See* Am. Compl. ¶¶ 61-78.

Taken together, these allegations are sufficient to show that Mr. Lopez has alleged adequately the fifth element of a plausible discharge violation claim, that Wells Fargo willfully did not update or correct its reporting on the status of his account.

### Conclusion

For the reasons stated herein, and based on the entire record, Wells Fargo's Motion to Dismiss the claims of Joseph Lopez for a violation of the discharge injunction is denied. An order in accordance with this Memorandum Decision shall be entered simultaneously herewith.

**Dated: Brooklyn, New York**
**August 14, 2020**

**Elizabeth S. Stong**
**United States Bankruptcy Judge**